UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

RONALD EUGENE BREWER, JR.,        )
                                   )
              Petitioner,          )
                                   )
v.                                 )        No. 2:15-CV-183-JRG-MCLC
                                   )
GERALD MCALLISTER,                 )
                                   )
              Respondent.          )

## MEMORANDUM OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by pro se prisoner Ronald Eugene Brewer, Jr. ("Petitioner"), challenging the constitutionality of his confinement under a state court judgment of conviction of first degree premediated murder, first degree murder in the attempt to perpetrate first degree murder, and criminal attempt to commit first degree murder [Doc. 1]. Respondent filed a response in opposition to Petitioner's pleading, as well as a copy of the state record [Docs. 11, 12]. For the reasons set forth below, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

## I.      PROCEDURAL HISTORY

Following a jury trial, Petitioner was convicted of first degree premeditated murder, first degree murder in the attempt to perpetrate a first degree murder, and criminal attempt to commit first degree murder. Following a sentencing hearing, the jury sentenced the Defendant to life imprisonment without the possibility of parole for each count of first degree murder. The trial court merged the two counts of first degree murder and imposed a concurrent twenty-five-year sentence for the third count. Petitioner appealed his conviction. Discerning no reversible error,

on July 14, 2011, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the trial court's judgment. *State v. Ronald Eugene Brewer, Jr.*, No. E2010–01147–CCA–R3–CD, 2011 WL 2732566, at *22 (Tenn. Crim. App. July 14, 2011). The Supreme Court of Tennessee ("TSC") denied discretionary review on September 21, 2011. Petitioner did not seek review from the United States Supreme Court.

Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. *Brewer v. State*, No. E2013-01537-CCA-R3PC, 2014 WL 890949, at *1 (Tenn. Crim. App. Mar. 6, 2014). On March 6, 2014, the TCCA affirmed the denial of post-conviction relief. *Id.* The TSC denied discretionary review on August 26, 2014.

Petitioner filed a timely pro se petition for a writ of habeas corpus on July 2, 2015 [Doc. 1]. This matter is now ripe for the Court's review.

## II.    FACTUAL BACKGROUND

The facts of this case have been previously summarized by the TCCA as follows:

Around 8:30 p.m. on December 9, 2008, Jackson Blue Sellers, the eighteen-year-old victim, was talking to friends in the parking lot of the Rogersville Wal–Mart when he was shot and killed by the nineteen-year-old Defendant. When the Defendant fired his rifle into the parking lot from an abandoned car wash perched upon an adjacent hill, the victim was not his intended target. The Defendant claimed that, when he fired the shot, he was trying to wound, but not kill, Josh Hinkle.

....

The State presented the testimony of multiple witnesses who were in the Wal–Mart parking lot at the time the victim was shot. Jason Greene recalled that he and the victim were engaged in a conversation with some friends. Mr. Greene turned around toward his vehicle to get a cigarette and, at that time, he heard what he thought was a firecracker. When he came back to where the victim was standing, he saw the victim holding his throat. Mr. Greene stated that blood started to come out of the victim's mouth and that the victim then fell to the ground.

Meghan Brooks testified that, during the evening of December 9, 2008, she went to Wal–Mart with her friend Samantha Allen. By the time they arrived, some of their friends had already started gathering in the parking lot. She recalled that

Jordan Hinkle, Josh Hinkle, Jason Morelock, Cody Harmon, Travis Goins, and the Defendant were all there. She said that Mr. Goins yelled for her to come over to where he and the Defendant were, however, she did not go over right away. The two men then drove over to Ms. Brooks and spoke to her. Before they pulled off, the Defendant told Ms. Brooks to "make sure none of these boys leave the parking lot" and "that he was serious." Ms. Brooks said that Mr. Goins and the Defendant were in a black Nissan Maxima and that she saw them leave the parking lot and go toward the highway.

Ms. Brooks saw the two men return, about ten to fifteen minutes later, and park in the parking lot "[f]or a little bit." Then, she witnessed them leave through Wal–Mart's back entrance. After she saw them leave, she said that she and the other people there "[j]ust sat around and socialized." About five minutes after the Defendant and Mr. Goins left the parking lot, however, Ms. Brooks heard a "pop." She testified that the victim began bleeding from his mouth and then fell to the ground.

Ms. Brooks said she believed that Josh Hinkle and Jordan Hinkle were affiliated with a gang called the Bloods, whose color was red, and that the Defendant and Mr. Goins were affiliated with a gang called the Crips, whose color was blue.

....

Josh Hinkle, who was twenty years old at the time of the trial, testified that he was affiliated with a gang called the Bloods on December 9, 2008. However, he said that, since then, he had "tried to put all that stuff behind [him]." He testified that he knew both the Defendant and Mr. Goins and that he and the Defendant "have had problems since back in middle school" because they did not see eye to eye. He acknowledged that, if they saw each other at the "right time," then they "might fight," but that they never pre-arranged times to fight. Josh Hinkle said there were also problems between him and Mr. Goins because they had been involved in a car accident in Mr. Goins' step-father's vehicle a few years prior and Josh Hinkle refused to pay to repair the damaged car.

On the night of the shooting, Josh Hinkle went to the Wal–Mart parking lot and "just hung out with a lot of people." He recalled that, at the time of the shooting, he was sitting on a corral where returned shopping carts are kept. He stated, "Everybody else was standing around me, and then we heard pop, a real loud pop." He said that he then saw the victim grab his neck and collapse.

....

Through testimony of an employee who worked at a gas station near the crime scene, the State introduced surveillance pictures showing the Defendant and Mr. Goins at the gas station at 5:31 p.m. The pictures show that the men were in a black Nissan Maxima.

Dr. William McCormick performed an autopsy on the victim and testified that the victim "was shot one time at a distance with a bullet entering the junction in the back of the head and the upper neck, just to the left of midline. The bullet angled from above downward and ended up lodged on the inside of the large jaw, the mandible." Dr. McCormick also stated that, when the bullet traveled through the victim's neck, it caused bleeding. He said that he found that the victim both inhaled and swallowed blood and that the victim's death, caused by his aspiration of blood, "would have been rapid but not instantaneous."

Special Agent Scotty Ferguson from the Tennessee Bureau of Investigation testified that he reported to the crime scene the night of the shooting, but he arrived after the victim was taken to the hospital. Although he could not be sure where the victim was standing when he was shot, based on witness statements, he estimated that the victim was standing approximately ninety-two feet from the edge of the concrete at the old car wash. He also said that the victim was standing approximately twenty-two feet from where Josh Hinkle was sitting on the shopping cart corral.

Special Agent Ferguson recalled that the Defendant was arrested on December 13, 2008. After his arrest, the Defendant gave consent for the police to search the black Nissan Maxima, which was found at his father's girlfriend's residence. Special Agent Ferguson testified that a .22 caliber shell casing was found on the floorboard on the front passenger's side of the Nissan Maxima.

On December 13, 2008, the Defendant signed a rights waiver and gave a statement to Special Agent Ferguson. In pertinent part, the Defendant's statement provided as follows:

> Josh Hinkle and Travis [Goins] used to be good friends. Josh wrecked Travis's car (it had been Travis's dad's car). Josh never paid Travis back for the car.
>
> This has been going on since 2003. I was trying to get Josh for Travis. Josh always runs from Travis and me.
>
> Josh has got some of his little buddies to talk trash and stuff about me and Travis. They do it on the phone and on My Space. Josh and his little boys think they are Bloods. Bloods are black.
>
> ....
>
> They send messages on My Space about beating me up. Josh calls on my cell phone and says he wants to fight but he never shows up.

I had went to Josh's house but learned he lives with his Grandmother. I learned it was his Grandmother's place and she is elderly so I didn't want to disrespect her.

Jordan Hinkle and some of his black buddies said on My Space that they were going to come and kick in my Grandmother's door. This was around February....

I saw Jordan Tuesday afternoon at school. He was throwing up gang signs (at the buses). It was when they were getting out of school at about 3:00 p.m. I was driving the black Nissan Maxima. I got it since I was getting ready to have a kid. I got out and did it back to him. Travis and Adam (red hair) were with me and saw Jordan throwing the signs.

Me and Travis rode around some that day. We took showers (Dad's house). I live with my Granny. We went to Travis's girl's house (Jasmine) but she was sick. We rode around town and talked to some people. We went to Wal–Mart. We were sitting w[h]ere everyone was. Travis was talking to Jim Ward and I was talking to Shane Harmon/Harlan (just got out of Army). Jordan and Josh pulled up in their Brat. Jordan jumped out and started talking to all the Blood dudes. Jordan said I seen Eugene Brewer at school but then he seen me sitting there so then he started whispering to his buddies. Jordan came over to the car and talked to Travis. Jordan said that he didn't have a problem with Travis but just with me. I told him that I never had a problem with him until he threatened to kick my Grandmother's door. He then left and went back to his buddies.

We then went to Big Lots to see if anyone was there. We then went to Jasmine's because Travis was worried someone else might be there. Then we came back to Wal–Mart. We went to same spot and I talked to Shane again. Everyone was just talking and staring and stuff. More of Josh and Jordan's friends (Bloods) started coming in and you know something was up. I can feel the animosity. I have seen Josh and Jordan with guns before. I did not see any guns that night but they have threatened to shoot me.

I then talked to Danny Bledsoe—him and Candy were getting ready to go into Wal–Mart. I told Danny that they were getting pretty deep and I thought something was going to happen....

I thought something was going to happen. They kept getting deeper and deeper. I asked Danny if he would help and he said he would

but he did not believe anything was going to happen. Danny went on in the store.

Me and Travis just sat there and watch what was going on.... They were yelling at us but never came toward us. We went to Dad's to get the [ .]22 rifle. The gun was in my bedroom. It was short and had a scope. It held 6 rounds. It was loaded. I worry about them kicking my doors in. Beck and Rhonda were there[.] I don't think they saw me get the gun. Travis went in to charge his phone. I don't know if Travis saw me or not. I put the gun beside the seat. The gun was between the driver's seat and console. Rhonda came out while I was sitting in the car. Rhonda said Brandon West was put in jail. She said that Travis was charging his phone and would be out in a minute.

We went back to Wal–Mart. I was driving. We parked in front of the gas part. We were parked about 15 minutes. We moved up some in the parking lot. We drove around toward Wal–Mart and then to another parking spot on the other side of them. I saw Brandon West drive around and go out at the red light. They (Hinkle's [sic] and Bloods) were hollering. There were more coming in. They were yelling at us and making hand gestures.

We sat there a little longer. I figured they would eventually come to the car. They were driving around our car some. We left the parking lot. We went up to the car wash. We sat there. We just were off 66.

I got into the passenger seat. Travis drove to where we could see the people. He pulled too close. I told him to pull back. Everyone knew we were up there. I put the gun out of the window and I asked Travis where Josh was sitting. He said he was sitting on the cart thing. Travis asked me not to kill him so I aimed low (chest area). I pulled the trigger. I assume Jackson walked in front of Josh. I don't know Jackson. We drove off. We went to Kingsport on the back roads. We went to some apartment parking lot.

Travis began getting scared. He was excited when I first shot. We had about hit a police car on 11 W (it had its blue lights). After that Travis freaked out whenever a car passed. He said we can't go back to Rogersville, he would lose his job and not see his daughter. At the parking lot Travis was getting calls that people were threatening his family. He kept saying he was going to turn himself in.

I spent the night in the car. I have only slept one night since it happened.

> I tried to call Kayla.
>
> The car is at Rhonda's trailer in Bulls Gap. She does not know it is there. I threw the gun in a dumpster in Kingsport. I think it was Model City Apt. we were at. I put the gun in one of the large dumpsters that a truck picks up. The dumpster was right there at the apartments we were at. The dumpster was to the right.
>
> The dude that died, I did not mean for him to die. I would tell him I was sorry. There is nothing I can say to [sic] dude, he is gone.
>
> I kept the gun was [sic] in my room. Dad had the gun. Mom had took it but Mom brought it back.
>
> I was just wanting to see Kayla. We were in Dad's van.
>
> I gave this statement freely and voluntarily. No threats or promises have been made to me. I gave this statement because I wanted to tell the truth and give my side of the story.

When Special Agent Ferguson was asked about the Defendant's demeanor while he was giving the statement, he replied, "I wouldn't say he was overly upset and not real, real nervous. He was actually very matter of factly."

Assistant Chief James Hammonds, from the Rogersville Police Department, testified that, on December 15, 2008, after the Defendant's arraignment, he transported the Defendant from Rogersville to the Grainger County Jail. He stated that, during the trip, the Defendant said, "[T]his is just a bad dream and I am waiting to wake up[.] I've really messed up."

Shelley Betts, employed by the Tennessee Bureau of Investigation and assigned to the firearms identification unit, testified that she examined a fired cartridge case and described that "[i]t was a Remington manufactured brass cartridge case, and it was .22 long rifle caliber." Ms. Betts also examined the bullet that struck the victim and said that "it was consistent in all regards to Remington bullets."

Investigator James Quick, from the Knoxville Police Department Intelligence/Gang Unit, testified that he identifies gang members by utilizing a point system that "break[s] down gang identifiers as well as criminal activity." He explained that, if a person had ten points or more, it would verify that they were a gang member. Investigator Quick testified that he reviewed literature, pictures, and posters found in a search of the Defendant's bedroom and assigned twenty-three points to the Defendant.

The Defendant, twenty-one years old at the time of the trial, testified that he became fascinated with the Crips when he was ten or eleven years old and was a member of the gang. He described Josh and Jordan Hinkle as "wannabe Bloods." However, he explained that their different gang affiliations did not cause his dislike of the Hinkles. The Defendant said that "the feud started over the car of Travis's deceased father. Hinkle had wrecked it and said he would pay for it, the damage, and never did."

On the night of the shooting, the Defendant said that, when he was in the Wal–Mart parking lot, he felt "the tension was building up." He elaborated, "I figured something was going to happen because it was ... the first time that me and Hinkle had actually been that close to one another without him running away." Therefore, he went to his father's house and got a .22 caliber rifle. The Defendant claimed that he got it because he knew the Hinkles "tend to carry guns and stuff."

The Defendant recalled that he and Mr. Goins returned to the parking lot and observed people "standing around there and talking and stuff and making hand gestures or whatever towards" their car. He explained that the hand gestures he saw were used to indicate "what are you looking at, or something like, do you have a problem?"

Then, the two men went up to the car wash. When asked why, the Defendant replied, "I wanted to observe the crowd of people, I guess at a better angle." The Defendant described what happened next as follows:

> [W]e pulled up on the backside of the car wash and we sat there for a minute. And I told Travis to get in the driver's seat, so I got out and walked around the car, and he walked around the front of the car and I walked around the back. And then when I got in the car I took the gun out and put it on my side, on the passenger side. And then when he got, you know, in the driver's seat he pulled through the back bay and went around to the front until we could see the parking lot. And he pulled up more towards the parking lot than I wanted him to so I asked him to pull back. And then he pulled more to the building, and I put the gun out the window. And I looked through the scope and it was dark so I couldn't see real well at the time. I mean, I could see where the light in the parking lot was on the people standing there. And I seen Hinkle sitting on the car— return cart rack, and I made sure, I asked Travis, I said, Is Hinkle setting on the cart rack? And he told that, yes, that's where he's sitting.

> And then, you know, I looked through the scope again or whatever, and Travis asked me not to kill no one. And I had no intentions of killing anyone, anyways. I aimed low like below the hip—between

the hip and knee area because he was sitting on the cart rack. And I pulled the trigger.

The Defendant said that they then drove away. He claimed that he did not know if anyone had been struck by the bullet. However, when asked why he left, he replied, "I fired a shot into a—a public area."

The Defendant explained that the catalyst that brought about the shooting was a threat that the Hinkles had made to kick in his grandmother's door and shoot at her house. He testified, "I was just tired of the threats and, you know, I had started dwelling on the situation so I decided, you know, I figured I would scare the dude." Although the Defendant did not agree that he planned the shooting, he acknowledged that he "thought about it."

The Defendant maintained that, when he fired the rifle, he "aimed to wound and scare" Josh Hinkle. However, when asked whether he knew he shot somebody when he left the scene, he replied, "Well, yes. I aimed at the dude to wound and scare him. So I figured it would hit him. I figured somebody would have been shot."

Regarding the notation in his statement that he aimed for Josh Hinkle's chest area, the Defendant said that Special Agent Ferguson must have misunderstood him. He recalled his conversation with Special Agent Ferguson as follows: "[H]e said, What do you mean low? He said, [c]hest area? And I said, no, chest would be high."

Regarding his assumption that the victim must have walked in front of Josh Hinkle at the moment he fired the rifle, the Defendant explained, "It was the only thing I could figure out because at the time I didn't—nobody was in front of him. I mean, they [sic] might have been people off to the right of him or the left of him. There was nobody directly in front of him, though." The Defendant said that he did not know the victim and that, as far as he knew, the victim "had nothing to do with any gang activity."

*State v. Brewer*, 2011 WL 2732566, at *1–8.

## III. STANDARD OF REVIEW

The Court must review Petitioner's request for habeas corpus relief pursuant to the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows state prisoners to seek federal habeas corpus relief on the ground that they are being held in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254; *Reed v. Farley*, 512 U.S. 339, 347 (1994). Congress has mandated that federal courts review

state court adjudications on the merits of such claims using a "highly deferential" standard of review. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Under this deferential standard, this Court is bound to accept the state court's findings of fact as true unless a petitioner presents "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1)(providing that "a determination of a factual issue by a State court shall be presumed to be correct" unless the petitioner rebuts that presumption with clear and convincing evidence); *see Seymour v. Walker*, 224 F.3d 542, 551-52 (6th Cir. 2000). Additionally, this Court may not grant habeas relief to a state prisoner unless the state court's decision on the merits of his claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Clearly established federal law," for the purposes of § 2254(d)(1), refers to rulings of the United States Supreme Court in place at the time of "the last state-court adjudication on the merits." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)(defining clearly established federal law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision"). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state-court decision unreasonably applies clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The standards set forth in the AEDPA are "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)). Ultimately, the AEDPA's highly deferential standard requires this Court to give the rulings of the state courts "the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## IV. PETITIONER'S ALLEGATIONS

Petitioner's § 2254 habeas corpus petition raises three main claims for relief and numerous sub-claims [Doc. 1]. The three main claims presented by Petitioner are claims of ineffective assistance of trial counsel ("Claim 1"), the trial court's improper denial of Petitioner's change of venue request ("Claim 2"), and improper admittance of Petitioner's confession into evidence ("Claim 3"). Respondent asserts that the petition should be denied with prejudice because the above-mentioned claims are either non-cognizable, deficiently pleaded, procedurally defaulted, and/or meritless [Doc. 11].

### A. CLAIM 1: INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims his conviction and sentence are void because his trial counsel was ineffective. Specifically, Petitioner lists the following 7 sub-claims:

1. Trial counsel failed to present intoxication as a defense [Doc. 1 at 5-6];

2. Trial counsel improperly advised Petitioner to concede the incident was gang-related [Doc. 1 at 6];

3. Trial counsel failed to present an adequate defense at sentencing [Doc. 1 at 7];

4. Trial counsel failed to object to an improper jury selection [Doc. 1 at 8];

5. Trial counsel failed to object to prosecutorial misconduct [Doc. 1 at 10-14];

6. Trial counsel failed to move to exclude information regarding Petitioner's listing on the TBI's "Most Wanted" list [Doc. 1 at 14]; and

7. Trial counsel failed to request jury instructions regarding jury conduct while in recess [Doc. 1 at 14].

Respondent argues that all of the claims of ineffective assistance of trial counsel are either deficiently pleaded, procedurally defaulted, and/or meritless [Doc. 11 at 20].

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a Sixth Amendment right not just to counsel but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the proceedings unfair and the result unreliable. *Id*. In assessing counsel's performance, a court must presume that counsel's questioned actions might have been sound strategic decisions and must evaluate the alleged errors or omissions from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Id*. at 689; *see also Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]") (quoting *Strickland*, 466 U.S. at 690). Only when the challenged actions are "outside the range of professionally competent assistance" will counsel's performance be considered constitutionally deficient. *Strickland*, 466 U.S. at 690.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

When a petitioner raises an ineffective assistance of counsel claim in a § 2254 petition, the Court must review the state court's ruling on that claim under the highly deferential standard of the AEDPA. Thus, in order to succeed on a federal claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that the state court's ruling on his ineffective assistance of counsel claim was an unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). "Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

### 1. SUB-CLAIMS 1-3

Applying this governing legal standard for determining whether counsel was ineffective in failing to present an intoxication defense at trial, agreeing at trial to the State's theory of the Petitioner's gang involvement, and failing to present a defense at sentencing, the TCCA addressed the claim as follows:

The post-conviction court stated in its order denying relief,

> The Court finds that [trial counsel] counseled with Petitioner, investigated the case with the help of his investigators, interviewed all witnesses, inspected all evidence, explored all defenses, filed the appropriate motions and made reasonable tactical decisions throughout petitioner's trial.... [T]he Court finds that Petitioner received effective assistance of counsel by his attorney, [trial counsel].

The record does not preponderate against the post-conviction court's findings. At the post-conviction hearing, trial counsel testified regarding the potential intoxication defense,

> I—we did talk about intoxication and, in fact, to me, it was more potentially a defense in trying to attack his statement, and that didn't work. Voluntary intoxication is not the greatest defense and I told

13

him that. And when your actions indicate perhaps that you know you've done something wrong by, for example, running, it makes that defense rather difficult to carry, and we discussed that, yes.

The Petitioner, in his testimony at the post-conviction hearing, acknowledged that trial counsel attempted by motion to exclude the gang-related testimony from the trial but that the trial court allowed admission of "certain" evidence. When asked whether he wished that trial counsel had called more witnesses at sentencing for mitigation, the Petitioner stated, "I don't really reckon it would have mattered." Moreover, the Petitioner did not identify any additional potential witnesses. As far as calling a consulted physician as a witness for the defense at sentencing, trial counsel testified, "[H]is testimony, if cross-examined by the State, could have been more damaging than good on issues ranging from [the Petitioner's] future activities and issues such as remorse."

Moreover, the Petitioner was unable to answer several questions regarding allegations made in his petition, and he explained that another inmate drafted the petition for him and that he simply signed it. The following colloquy occurred between the State and the Petitioner:

> Q: In fact, you didn't have any problems with [trial counsel], did you?
>
> A: No. I just—I had to use the counsel thing to file this appeal.
> ....
>
> Q: So, there's really, sir, if I understand it right, there's no—[trial counsel] was not ineffective in anything, you're just using that to get the Court to reconsider it; is that correct?
>
> A: Yes.
>
> Q: So you don't know of anything that [trial counsel] didn't do or did do that should have been different, do you, sir?
>
> A: No.

We agree with the post-conviction court that the Petitioner failed to establish that trial counsel was deficient in his representation of the Petitioner. Thus, we need not address the prejudice prong. *See Goad*, 938 S.W.2d at 370. Accordingly, the Petitioner has failed to establish ineffective assistance of counsel, and he is entitled to no relief on this issue.

*Brewer*, 2014 WL 890949, at *14.

Respondent argues that Petitioner "has failed to identify how the reviewing court was unreasonable in its application of the standard or in its determination of the facts based upon the record before it" [Doc. 11 at 22]. In fact, Respondent claims that the majority of Petitioner's habeas petition, "is a verbatim reiteration" of the arguments contained in his brief to the Court of Criminal Appeals containing no new information or argument [*Id.*].

This Court finds that Petitioner has not met his burden of demonstrating that he is entitled to relief on this claim as he has not provided any evidence to diminish the deference owed to the state court's factual findings under § 2254(d). Petitioner may disagree with the result reached by the state courts, but he failed to describe how the state court's adjudication of his claim was anything other than reasonable under the *Strickland* standard. Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief. *See Cross v. Stovall,* 238 F. App'x 32, 39–40 (6th Cir. 2007). Based on this Court's review of the record, the state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. Accordingly, the state court's rejection of sub-claim's 1, 2, and 3 was not unreasonable and Petitioner is not entitled to relief on those sub-claims.

### 2.    SUB-CLAIMS 4-7

Respondent argues that many of Petitioner's arguments are procedurally defaulted because Petitioner did not properly raise the claims in his direct appeal or in his appeal of the denial of his post-conviction relief. Specifically, Respondent alleges that Petitioner has procedurally defaulted the following ineffective assistance of counsel claims:

4.  Trial counsel failed to object to an improper jury selection [Doc. 1 at 8];

5.  Trial counsel failed to object to prosecutorial misconduct [Doc. 1 at 10-14];

6. Trial counsel failed to move to exclude information regarding Petitioner's listing on the TBI's "Most Wanted" list [Doc. 1 at 14]; and

7. Trial counsel failed to request jury instructions regarding jury conduct while in recess [Doc. 1 at 14].

A petitioner who fails to raise his federal claim in the state courts and who is now barred by a state procedural rule from returning with the claim to those courts has committed a procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default forecloses federal habeas review, unless a petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id.* at 732. Where a 2254 petitioner could only raise a claim for a trial attorney's ineffective assistance of counsel for the first time in post-conviction proceedings, however, ineffective assistance of post-conviction counsel may be "cause" to excuse the procedural default of such a claim. *Wallace v. Sexton*, 570 F. App'x 443, 452–53 (6th Cir. 2014); *Trevino v. Thaler*, 133 S.Ct. 1911, 1918–21 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). This exception applies to post-conviction proceedings in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

Here, Petitioner admits that the above listed claims are procedurally defaulted but asserts that he has cause to excuse the default under *Martinez* [Doc. 1 at 8]. However, this Court finds that ineffective assistance of counsel at this stage of the case cannot constitute cause to excuse the procedural default because it is not an initial-review collateral proceeding. Although *Martinez* and *Trevino* expanded the class of cases in which a petitioner can establish cause to excuse the procedural default of ineffective-assistance claims, the Supreme Court cautioned that the rule "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial." *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413. Where a petitioner alleges ineffective assistance of post-conviction counsel to establish cause

to excuse his default of an ineffective assistance of trial counsel claim and he alleges that the ineffective assistance of post-conviction counsel occurred only on appeal of his post-conviction petition, this exception does not apply because the appeal was not the first time the petitioner could have raised the claim. *Wallace*, 570 F. App'x at 457. "While counsel's errors in [other levels of post-conviction] proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding." *Id.*

In the instant matter, Petitioner properly raised these issues in his initial collateral review proceedings. *See Attachment 23, pgs. 41, 45, 50; Attachment 15, page 48*. Thus, the alleged ineffective assistance of Petitioner's post-conviction appellate counsel is not cause to excuse the procedural default of his ineffective assistance of trial counsel claims, and the Court may not consider these claims on the merits.

Furthermore, the Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional claim, *see id.* at 1315, and Petitioner does not argue it as such here. Ineffective assistance of post-conviction counsel is relevant only if it is cause for failure to comply with a procedural rule. Petitioner has not shown that the error of his post-conviction trial counsel caused his non-compliance with a procedural rule in the post-conviction appellate court. Accordingly, his ineffective assistance of counsel sub-claims listed above are procedurally defaulted and Petitioner is not entitled to relief on those sub-claims.

B.      **CLAIM 2: RIGHT TO AN IMPARTIAL JURY**

Petitioner claims that his right to an impartial jury was violated by the trial court's refusal to grant him a change of venue [Doc. 1 at 15-21]. Petitioner's claim is framed as a violation of the Sixth Amendment.

After review of the record, this Court finds that Petitioner did not fairly present this claim to the state court as a federal constitutional violation. Although Petitioner argued on direct appeal that the trial court erred in refusing a change of venue, he did so solely under Rule 21 of the Tennessee Rules of Criminal Procedure, and cited only state law cases in support [Attachment 20 at 30].

Exhaustion of state remedies "requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the ''opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275)). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Id.* at 365-66. Thus, before seeking a federal writ of habeas corpus, a state prisoner must fairly present his claim to each appropriate state court by alerting that court to the federal nature of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

In this case, Petitioner did not cite to any provision of the United States Constitution in his brief to the TCCA on direct appeal nor cite to a single Supreme Court or federal case in support of his claim. *See Dye v. Hofbauer*, 546 U.S. 1, 3-4 (2005) (claim that featured citations to specific provision of the Constitution and four federal cases alerted the state court that the claim "was based, at least in part, on a federal right"); *Trimble v. Bobby*, 804 F.3d 767, 781 (6th Cir. 2015) (federal claim clearly presented to state court where claim explicitly involved three separate federal constitutional provisions and four Supreme Court cases in support).

Petitioner's failure to alert the TCCA to any federal claim arising from the failure to prove venue is confirmed by the TCCA's decision on direct review, as the appellate court analyzed and

denied Petitioner's claim solely under the Tennessee state constitution, the Tennessee Rules of Civil Procedure, and state case law. Because Petitioner failed to fairly present his challenge to venue as a federal constitutional claim to the TCCA on direct appeal, he failed to exhaust that claim, and he now is precluded from returning to state court to pursue it. Accordingly, his claim is procedurally defaulted. Moreover, Petitioner has asserted no cause for not raising that issue as a constitutional claim on direct appeal, nor has he asserted prejudice arising from the procedural default of that claim. As a result, Petitioner is therefore not entitled to relief on this claim.

## C.    CLAIM 3: INVOLUNTARY WAIVER AND STATEMENT

Petitioner claims that his waiver and statement was given involuntarily and in violation of the Fifth Amendment [Doc. 1 at 21]. In response, Respondent argues that the appellate court's finding that petitioner's confession was voluntarily given was not contrary to, or an unreasonable application of, clearly established federal law or based on unreasonable determination of facts in light of the evidence present in state court [Doc. 11 at 25].

The TCCA explained that the right against self-incrimination is protected both by the Fifth Amendment to the United States Constitution, and the Tennessee Constitution article I, section 9. *Brewer*, 2011 WL 2732566, at *15. To help ensure the protections of the Fifth Amendment in the criminal process, the United States Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. (*citing* 384 U.S. 436, 444 (1966)). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* A defendant can waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* "In determining whether a

confession has been made knowingly and voluntarily, courts must look to the totality of the circumstances." *Id.*

Petitioner argued on appeal that the written statement he signed after being interviewed by Special Agent Ferguson on December 13, 2008, as well as an oral statement he made in the car to Assistant Chief Hammonds on December 15, 2008, was not voluntary under the Fifth Amendment, and that the trial court erred in denying his motion to suppress and admitting these two statements. The TCCA, citing *Miranda v. Arizona*, employed a virtually identical version of the totality of the circumstances test outlined above in reviewing Petitioner's claim of involuntary confession. Thus, its conclusion relative to this claim is not contrary to well-established Supreme Court precedent. Therefore, the task before the Court is to determine whether the state court's application of clearly-established Supreme Court precedent to the facts of petitioner's case was unreasonable.

As recounted by the TCCA:

The Defendant was arrested on December 13, 2008, and questioned later that day. Special Agent Ferguson testified that he advised the Defendant of his rights and that he witnessed the Defendant waive his rights at 6:40 p.m. He interviewed the Defendant and reduced his version of events to writing. Special Agent Ferguson said that Investigator Collingsworth reviewed the statement with the Defendant and that the Defendant signed the statement at 8:20 p.m. Moreover, Special Agent Ferguson recalled that the Defendant "seemed to be fine" and that he "communicated very well." Although the Defendant claimed that he did not sign the rights waiver form until after he gave his statement, the trial court found that the Defendant's statement was given after he was advised of, and waived, his rights. We conclude that the evidence does not preponderate against the trial court's finding that the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

We also conclude that the trial court did not err when it denied the Defendant's motion to suppress the oral statement he made in the car to Assistant Chief Hammonds. Officer Pinkston testified that, on December 15, 2008, the Defendant was advised of, and waived, his *Miranda* rights. The Defendant also acknowledged signing a waiver form before he was transported to Kingsport and that he made the comment in the car to Assistant Chief Hammonds spontaneously, without any questioning from the officer. Although the Defendant contends that he did not say "I really messed up," the trial court noted that the officer made notes about the

Defendant's comment and that it was a "credibility issue." We conclude that the evidence does not preponderate against the trial court's findings that the Defendant's comment to Assistant Chief Hammonds was made after he had been advised of, and waived, his *Miranda* rights.

Finally, the Defendant argues that the statement he allegedly made to Assistant Chief Hammonds is not relevant and should have been excluded. Assistant Chief Hammonds testified that the Defendant said, "This is just a bad dream and I'm waiting to wake up. I've really messed up." We conclude that the trial court did not abuse its discretion in allowing the statement to be admitted into evidence. The Defendant is not entitled to relief on this issue.

*Brewer*, 2011 WL 2732566, at *16.

While Petitioner argued that his waiver and statement were involuntarily given, Petitioner has not provided any evidence to diminish the deference owed to the state court's factual findings under § 2254(d). Rather, the evidence in the record indicates otherwise.

Special Agent Ferguson testified that the Defendant was arrested on the evening of December 13, 2008, and that he took a written statement from the Defendant the same night. Special Agent Ferguson said that he advised the Defendant of his constitutional rights before taking the statement and that the Defendant signed a written waiver of those rights at 6:40 p.m. Special Agent Ferguson recalled that the Defendant "seemed to be fine" and that he did not seem intoxicated. He also stated that the Defendant "communicated very well" and he described the Defendant's demeanor as "just very matter of fact." Special Agent Ferguson testified that he reduced the Defendant's comments to writing and that Investigator Teddy Collingsworth from the district attorney's office reviewed the statement with the Defendant. Special Agent Ferguson recalled that the Defendant signed the statement at 8:20 p.m.

Officer Chris Pinkston, from the Rogersville City Police Department, testified that he saw the Defendant at the police department on the morning of December 15, 2008. The Defendant had been transported from the Grainger County Jail to the Rogersville police station, from which he was going to be taken to Kingsport to help look for his gun. Officer Pinkston recalled that, while the Defendant was at the police station, the Defendant was advised of, and waived, his constitutional rights. Officer Pinkston signed the Defendant's admonition and waiver of rights form as a witness.

Assistant Chief James Hammonds of the Rogersville City Police Department testified that, on December 15, 2008, he transported the Defendant from the Grainger County Jail to the Rogersville police station, from the Rogersville police station to Kingsport, from Kingsport to Hawkins County General Sessions Court,

and then back to the Grainger County Jail. Assistant Chief Hammonds recalled that, during the trip from general sessions court to the Grainger County Jail, the Defendant said, "This is just a bad dream and I'm waiting to wake up. I've really messed up."

…

Regarding his mental state at the time he made the statement, the Defendant testified, "I had been smoking meth for three to four days since the shooting had happened." However, he testified that those things did not affect his statement and further explained, "I was in a hurry to get out of the room with the police." The Defendant acknowledged that Investigator Collingsworth read his statement to him and that he initialed it and signed it.

The Defendant remembered signing a second waiver at the Rogersville police station before he was taken to Kingsport. He testified that he was not questioned by the police officer driving him either on the way to Kingsport or on the way back to the jail.

On cross-examination, the Defendant testified that he understood he was arrested for murder when he arrived at the police station and that he was willing to tell his side of the story to the police officers. The Defendant said that the police did not threaten him or promise him anything. Regarding the comment he made in the car to Assistant Chief Hammonds, the Defendant recalled, "I didn't say I really messed up. I just said I wished I would wake up. It all felt like a bad dream."

*Brewer*, 2011 WL 2732566, at *14.

Based on the evidence in the record, the Court cannot find that the state's determination of the facts was unreasonable. The ruling by the state court deeming Petitioner's statement voluntary and admissible was neither contrary to, nor an unreasonable application of federal law. Petitioner is therefore not entitled to relief on this claim.

## V.    CONCLUSION

For the reasons set forth above, Petitioner's § 2254 petition [Doc. 1] will be **DENIED** and this action will be **DISMISSED**.

## VI.    CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a

final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El*, 537 U.S. at 327, 336; *Slack*, 529 U.S. at 484.  After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims.  First, as to the procedurally defaulted claims, jurists of reason would not debate the Court's finding that the claims are procedurally defaulted.  Further, in view of the law upon which the dismissal on the merits of the adjudicated sub-claim is based, reasonable jurists could not disagree with the correctness of the Court's resolution of this claim.  Because the Court's assessment of Petitioner's claims could not be debated by reasonable jurists, such claims are inadequate to deserve further consideration, and the Court will **DENY** issuance of a COA. *See* 28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Miller-El*, 537 U.S. at 327.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE